MARY KELLY, as Administratrix, etc., of ELLEN NEVILLE, Deceased, Appellant, v. BUFFALO SAVINGS BANK, Respondent.

*Savings bank — payment of a deposit on forged orders and the production of the pass book — when such payment is good as against a depositor and her legal representatives — rule applicable to such cases.*

Rules and regulations may be prescribed by a savings bank for the payment of money deposited in such bank and for its protection in making such payments.    These rules and regulations, when communicated to, and assented to by, depositors constitute the contract between the parties.    They do not, however, dispense with the exercise of ordinary care and diligence on the part of the bank officials when they provide that the bank will endeavor to prevent frauds, when facts and circumstances are brought to the knowledge of the bank at the time payments are made, which are calculated to, and ought to, excite the suspicion and inquiry of ordinarily careful bank officials.    It is the duty of the bank to institute such inquiry, and a failure to do so constitutes negligence and deprives the bank of protection in making such payments.    When the signatures to orders for the money are so unlike the signature in the bank signature book that the dissimilarity is readily and easily discernible by competent bank officials, the failure to so discern it is evidence of negligence on the part of the bank, but it is not such evidence when the differences in the signatures are not marked or apparent, and it would require a critical examination and comparison by such officials to detect them.

January 13, 1871, Ellen Neville opened an account in the Buffalo Savings Bank. Between that time and her death, about December 1, 1878, she personally presented the pass book at the bank for the purpose of making deposits, of having interest credited and of making withdrawals, thirty-three times.    The said Ellen Neville lived with her mother and her two sisters, Kate and Mary, and when she died, her pass book, which showed a balance to her credit of $884.43, came into the possession of the mother and sisters or some of them.

After the death of the said Ellen Neville some one of these three persons presented the book to the bank and had semi-annual credits of interest entered therein and made one deposit therein, and during a period of some five years withdrew, at five different times in various amounts, the entire amount of the deposit upon orders purporting to have been signed by the deceased. The savings bank did not learn of the death of the deceased until many years after the moneys had been withdrawn.

The trial court found that a critical examination and comparison of the signatures to the forged orders with the signature of the deceased on the bank's signature book would have made the forgeries apparent to a competent bank officer; that when the forged orders were presented, however, the bank made no critical examination or comparison of the forged signatures with the signature in the signature book, and that there did not exist such a difference between the five forged signatures and the signature in the bank signature book as would create doubt as to the genuineness of such forged signatures in the mind of a competent and reasonably careful bank officer when the forged orders, accompanied with the pass book, were presented by a person unknown to him.

The by-laws of the bank provided, " The secretary will endeavor to prevent frauds, but all payments made to persons producing the deposit books, or duplicates thereof, shall be deemed good and valid payments to the depositors respectively."

In 1901, eighteen years after the withdrawal of the moneys, and after the depositor's mother and sister Kate had died, the depositor's sister Mary was appointed administratrix of the estate of the said depositor and brought an action against the savings bank to recover the amount of the deposit.

*Held*, that the bank, in permitting the withdrawals to be made on the forged signatures, having acted with care and not having been guilty of any negligence, the payments were good and valid as against the deceased and her personal representatives.

APPEAL by the plaintiff, Mary Kelly, as administratrix, etc., of Ellen Neville, deceased, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Erie on the 21st day of February, 1903, upon the decision of the court, rendered after a trial at the Erie Trial Term, the jury having been discharged, dismissing the plaintiff's complaint.

*Harry D. Williams*, for the appellant.

*Adolph Rebadow* and *Charles D. Marshall*, for the respondent.

WILLIAMS, J. :

The judgment should be affirmed, with costs.

The action was brought to recover moneys deposited in defend-

ant savings bank by and in the name of plaintiff's intestate. The defense was that the moneys had all been withdrawn from the bank after the death of the intestate, but under circumstances which relieved the defendant from liability therefor. The trial was commenced before the court and a jury, but at the close of the evidence the parties stipulated that the jury should be discharged and the case submitted to the court for determination. The court thereafter decided the case, making findings of fact and of law. The case should, therefore, be regarded as tried before the court a jury having been waived. The facts found by the court are uncontroverted, except in a few respects which will be indicated.

The deceased, January 13, 1871, opened the account in question when she was eighteen or nineteen years old. The ordinary pass book was issued to her. She died about December 1, 1878. During her lifetime she personally presented the pass book at the bank sixteen times and had deposits entered therein and fifteen other times and had credits of interest entered therein. She presented the pass book twice and drew moneys from the account, signed the orders therefor and had the same entered upon the pass book, viz., September 22, 1873, $335.98, and July 7, 1877, $23.31. At the time of her death she had a balance to her credit of $884.43. She had a mother and two sisters, Kate and Mary, and apparently they all lived together. When she died the pass book was in the house and came into the possession of the mother and sisters or some of them. After the death of deceased some of these three persons presented the pass book at the bank and had semi-annual credits of interest entered therein in January and July of each year to and including July, 1883, and on March 4, 1882, deposited to the credit of the account and had entered in the pass book $70. After the death of deceased some of these three persons presented the pass book at the bank and drew from the account, signed the orders therefor and had the same entered upon the pass book, five different amounts, viz., December 28, 1878, $41.43; June 2, 1880, $50; July 30, 1881, $70.45; August 14, 1883, $56.62, and September 1, 1883, $937, the balance of the account. The name signed to each of these orders was that of the deceased and the person signing each order was not the personal representative of deceased. The defendant never knew of the death of deceased until many years after all the above moneys had been **drawn**

The mother and sister Kate became inmates of an asylum for the aged and infirm about 1895, paying at the time they entered $1,000. The mother died about 1900, and sister Kate about 1901. Mary, the other sister, is the only member of the family surviving. She was married in 1888, and is the administratrix who brings this action. The court found that by a critical examination and comparison of the signatures to the five forged orders with the signature of the deceased on the bank signature book, it would have been apparent to a competent bank officer that the five signatures were forged; that, when the orders were presented, the defendant made no critical examination or comparison of the forged signatures with the signature in the book, and that there did not exist such a difference between the five forged signatures and the signature in the book as to create doubt as to the genuineness of the five forged signatures in the mind of a competent and reasonably careful bank officer when presented by a person unknown to him with the pass book, and, *therefore*, the defendant exercised due care and caution and was not guilty of negligence in paying any of the moneys on the five forged orders. The signatures to the seven orders for money, two genuine and five forged, and the signature in the bank book, are before us, and, upon an examination thereof, we should say that such a similarity exists in all of them as to mislead ordinary persons, if not competent bank officers or handwriting experts. No objection can reasonably be made by the plaintiff to the findings upon this subject above referred to unless it be the last one, which may be regarded as a conclusion of fact that the defendant exercised due care and was not guilty of negligence in paying the money on the five forged orders.

The parties were bound by, and are subject to, the provision of section 21 of the by-laws of defendant, viz.: " The Secretary will endeavor to prevent frauds, but all payments made to persons producing the deposit books, or duplicates thereof, shall be deemed good and valid payments to the depositors respectively." The defendant claims that under the evidence in this case it was protected by this by-law and is not liable for the moneys so paid to the personal representative of the deceased. The mother and the two sisters were the only persons apparently interested in the amount of the deposit; after the death of deceased they had the pass book and

knew the money was on deposit with defendant and the amount of it. They gave the defendant no information as to the death; but from the death in 1878 until 1883, a period of five years, some one or more of them continued in the name of the deceased to have the accrued interest credited up on the pass book, made one deposit and drew moneys from the account in the name of the deceased until the whole amount of the money was drawn out. They imitated very closely the signature of the deceased in making the orders for the withdrawal of the moneys so that the defendant never suspected it was dealing with persons other than the deceased herself. The money having been wholly withdrawn in 1883, the matter was allowed to rest until 1901, a period of eighteen years, before a personal representative of the deceased was appointed, a demand made for the moneys, and this action commenced. The mother and sister Kate had then recently died in 1900 and 1901. It must be apparent that the family had the benefit of the moneys on deposit when the deceased died, and we can hardly believe that the plaintiff was ignorant of the withdrawal and use of the moneys. The court found that the moneys were withdrawn by the mother or one of the two sisters. It was not found that the withdrawal was with the knowledge and consent of the sister who is now the personal representative of the deceased, and the owner of the whole claim, if any, against the defendant, and who brings this action. The defendant is by the decision relieved from liability upon the ground that in paying out the moneys it acted with care and was guilty of no negligence, and, therefore, under by-law 21 the payments were good and valid as against the deceased and her personal representative.

The law governing the disposition of this case was laid down by the Court of Appeals many years ago, and has always since been adhered to by that court, viz.: Rules and regulations may be prescribed by savings banks for the payment of money deposited in such banks, and for their protection in making such payments. These rules and regulations, when communicated to, and assented to by depositors constitute the contract between the parties. They do not, however, dispense with the exercise of ordinary care and diligence on the part of the bank officials when they provide that the banks will *endeavor* to prevent frauds, when facts and cir-

cumstances are brought to the knowledge of the banks at the time payments are made, which are calculated to, and ought to, excite the suspicion and inquiry of ordinarily careful bank officials. It is their duty to institute such inquiry, and a failure to do so constitutes negligence and deprives the banks of protection in making such payments. When the signatures to orders for the money are so unlike the signature in the bank signature book that the dissimilarity is readily and easily discernible by competent bank officials, then the failure to so discern it is evidence of negligence on the part of the banks, but it is not such evidence when the differences in the signatures are not marked or apparent, and it would require a critical examination and comparison by such officials to detect it. (*Appleby* v. *Erie Co. Sav. Bank*, 62 N. Y. 12; *Allen* v. *Williamsburgh Sav. Bank*, 69 id. 314; *People* v. *Third Ave. Sav. Bank*, 98 id. 661; *Kummel* v. *Germania Sav. Bank*, 127 id. 488; *Gearns* v. *Bowery Sav. Bank*, 135 id. 557.)

Within these principles of law and in view of the specific findings of fact made by the court, the finding of the conclusion of fact that the bank acted with care and was not guilty of any negligence, and the payments were, therefore, good and valid against the deceased and her personal representatives, was, we think, properly made. The only facts or circumstances that suggest negligence and want of care are connected with the signatures and their dissimilarity, and the findings of fact on this subject relieve the defendant from any claim of such negligence.

We conclude that the judgment should be affirmed, with costs.

All concurred.

Judgment affirmed, with costs.